UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| ANGELA CARTER, *ADMINISTRATRIX* of the ESTATE OF TRAVIS HUNTER,   Plaintiff, | |
| v. | Case No.: 3:21-cv-445 |
| SHERIFF MICHAEL L. WADE, *in his individual capacity* and DEPUTY DAVID L. WATKINS, *in his individual capacity*   Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Angela Carter ("Plaintiff") as *Administratrix* of the Estate of Travis Hunter (the "Estate") by counsel, hereby moves this honorable Court for judgment against Sheriff Michael L. Wade ("Sheriff Wade") and Deputy David L. Watkins ("Deputy Watkins"). In support of her Complaint, Plaintiff states as follows:

## INTRODUCTION

1. This Complaint asserts claims pursuant to 42 U.S.C. § 1983, as well as claims pursuant to Virginia's wrongful-death statute, regarding the death of Travis Hunter ("Mr. Hunter").

2. Mr. Hunter is survived by statutory beneficiaries under Virginia's wrongful death statute (Virginia Code § 8.01-50 and § 8.01-53).

3. This Complaint details violations of the Fourteenth Amendment of the Constitution of the United States of America by Defendants, jointly and severally, occurring in the Henrico County Regional Jail West ("County Jail").

4. This Complaint further details gross negligence by the Defendants, all of whom are responsible, jointly and severally, for gross negligence under Virginia state law resulting in Mr. Hunter's death.

5. Defendant Wade was responsible for operating the County Jail so as to not endanger the health and safety of those incarcerated or detained there. Defendant Wade failed to provide constitutionally adequate conditions of confinement to inmates detained there, including Mr. Hunter.

6. Collectively, Defendants failed to provide necessary, adequate, and timely attention in response to Mr. Hunter's serious risk of harm. Through action and inaction, Defendants failed to prevent and directly caused Mr. Hunter's fatal injuries through their gross negligence and deliberate indifference to human life, in violation of Mr. Hunter's constitutional rights.

## JURISDICTION

7. This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, over Plaintiff's 42 U.S.C. § 1983 claims.

8. This Court has jurisdiction over these claims as they arise under the Constitution of the United States of America and have been brought before this Court pursuant to 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over the related state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), because the alleged claims arising under

Virginia law are so related as to form part of the same case or controversy arising under Plaintiff's 42 U.S.C. § 1983 claims.

## VENUE

10. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

11. Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## PARTIES

12. Plaintiff Angela Carter is a citizen of the United States and South Carolina. She is the Personal Representative of the Estate of Travis Hunter, deceased. Letters of Administration were granted to Ms. Carter by the Circuit Court of Henrico County on October 17, 2019.

13. Ms. Carter has brought this action in her capacity as Personal Representative of the Estate of Travis Hunter.

14. The Plaintiff's decedent is Travis Hunter, who at the time of his death, was a thirty-four-year old citizen of the United States, Mr. Hunter died on July 28, 2019 in Henrico County, Virginia. as a result of wrongful and unconstitutional acts of the Defendants.

15. At the time of the incident, Defendant Michael Wade was Sheriff of Henrico County. In that capacity, Sheriff Wade was charged with providing security for Henrico's two regional jails, including the County Jail in which Mr. Hunter died. At all times while

Mr. Hunter was detained at the County Jail, Sheriff Wade had a duty to maintain the custody and ensure the care of Mr. Hunter, and otherwise delegated that duty to his deputies, agents, and employees. Sheriff Wade is the official responsible for setting and enforcing the policies, customs, and practices of the County Jail. Sheriff Wade is sued in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates and for his acquiescence in the constitutional deprivations which this Complaint alleges, and for conduct that showed a reckless or callous indifference to the rights of others.

16. At the time of the incident, Defendant David Watkins was a deputy sheriff and employee of Sheriff Wade. As a deputy sheriff, Deputy Watkins was required to supervise, monitor, and provide access to medical/mental health treatment to the inmates and detainees. Deputy Watkins effectively totally ignored Mr. Hunter, despite the fact that he was supposed to observe Mr. Hunter for behavior changes and to respond to threats or attempts by Mr. Hunter to commit self-harm. At all times, Deputy Watkins was acting in the course of his employment as a deputy sheriff.

17. All Defendants are persons acting under color of state law pursuant to 42 U.S.C. § 1983.

## FACTS

18. Travis Hunter was born on April 21, 1985. He was the son of Angela Carter, the Plaintiff.

19. Mr. Hunter was arrested and housed at the County Jail on or about June 5, 2019 as a pre-trial detainee.

20. At the time of his death, Mr. Hunter suffered from a serious medical condition. In particular, he suffered from a psychiatric disorder and was depressed and suicidal. Shortly before his death, Mr. Hunter had been diagnosed as suffering from bipolar disorder, a psychiatric disorder with a known correlation to increased risk of suicide.

21. On June 5, 2019, Mr. Hunter was evaluated by Angela Smith, a member of the County Jail's mental health staff, at the request of the medical staff due to mental health concerns raised during Mr. Hunter's medical screening at booking.

22. Mr. Hunter reported to Ms. Smith that he had been diagnosed with attention deficit hyperactivity disorder ("ADHD"), insomnia, obsessive-compulsive disorder ("OCD"), and anxiety. Mr. Hunter further reported experiencing auditory hallucinations, specifically that he heard "thoughts that are not [his]," and that these thoughts directed him to "do stupid stuff; stuff [he] wouldn't normally do." Mr. Hunter also reported that he had been hospitalized at the Wilson Medical Center in Wilson, North Carolina in April 2019 following a psychotic episode.

23. According to Mr. Hunter's medical records from Wilson Medical Center, Mr. Hunter had also been previously diagnosed with depression.

24. Following Mr. Hunter's mental health evaluation on June 5, Ms. Smith ordered that Mr. Hunter be placed on a "level 3" mental health watch and that he be housed in Dayroom 210, a mental health pod, for further observation. Ms. Smith further ordered a follow-up with Mr. Hunter on June 6, 2019 for a reassessment and to complete his mental health evaluation.

25. On June 10, 2019, Mr. Hunter completed a sick call slip for mental health services, stating on the form that he needed to see a mental health professional "immediately."

26. On July 2, 2019, Ms. Smith ordered that Mr. Hunter be placed on a "level 1" suicide prevention watch and be transferred to Holding Cell #16, after Mr. Hunter made suicidal statements during a visit with his attorney. Specifically, Ms. Smith ordered that Mr. Hunter be placed on a "continuous watch with full precautions," and that Mr. Hunter have a "safety smock and safety blanket only; no sharps and no sheets."

27. A "constant watch" is the highest suicide prevention watch authorized by the Sheriff's suicide prevention operating procedures. These regulations, made effective March 2014, define "constant watch" as requiring the inmate to be "physically observed constantly to ensure that they are breathing, not physically distressed and not engaging in any self-injurious behaviors."

28. On July 3, 2019, Mr. Hunter was seen by Physician's Assistant Chelsea Dyer, per Ms. Smith's July 2 order, to follow up on his recent suicidal statements and to complete his mental health evaluation.

29. While Mr. Hunter denied suicidal ideation and behavior at his visit with P.A. Dyer, he once again reported his prior mental health diagnoses and his psychiatric hospitalization at Wilson Medical Center. Mr. Hunter also reported that he had recently been diagnosed with posttraumatic stress disorder ("PTSD").

30. After consulting Ms. Smith, P.A. Dyer ordered Mr. Hunter to be placed on a "level 3" mental health watch and a 30-minute **suicide prevention watch** and returned to Dayroom 210. Mr. Hunter was placed in Cell #5 in Dayroom 210.

31. According to the Sheriff's suicide prevention operating procedures, a 30-minute watch requires the inmate to be "physically observed randomly at least every thirty minutes to insure that they are breathing, not physically distressed and not engaging in any self-injurious activities."

32. On July 17, 2019, Mr. Hunter was seen by P.A. Dyer for a follow-up appointment ordered by Dr. Louis Fox due to concerns regarding Mr. Hunter's ongoing auditory hallucinations and tangential thinking. Mr. Hunter confirmed that he was continuing to experience auditory hallucinations, stating that he heard voices which "tell me sometimes how to answer questions."

33. At this appointment, Mr. Hunter was diagnosed with Bipolar I disorder with psychotic features. Bipolar disorder is a psychiatric disorder characterized by periods of depression and periods of abnormally elevated mood. People suffering from bipolar disorder are at a substantially increased risk of suicide.

### Deputy Watkins Does Not Monitor Mr. Hunter on July 28, 2019

34. On July 28, 2019, Mr. Hunter remained housed in Dayroom 210 on a 30-minute **suicide prevention watch**.

35. At approximately 2:53 p.m., Mr. Hunter was found hanging from a bedsheet tied to the top bunk in his cell in Dayroom 201.

36. In the hours leading up to Mr. Hunter's death, Deputy Watkins grossly failed to conduct appropriate security rounds and failed to adequately monitor Mr. Hunter, despite the fact that conducting these rounds was the only way to physically observe Mr. Hunter as required by his suicide prevention watch ordered by mental health staff. In fact, Deputy Watkins simply chose not to make rounds for many **hours**, despite knowing that

he needed to and was required to make the rounds for the safety of those housed in Dayroom 210, including Mr. Hunter.

37. The Virginia Department of Corrections promulgates Minimum Standards for Jails and Lockups, which apply to the County Jail. These standards require, among other things:

> *The facility shall provide 24-hour supervision of all inmates by trained personnel. All inmate housing areas shall be inspected a minimum of twice per hour at random intervals between inspections. All inspections and unusual incidents shall be documented. No obstructions shall be placed in the bars or windows that would prevent the ability of jail staff to view inmates or the entire housing area.*

6VAC15-40-1040.

38. Tragically, video surveillance from Dayroom 210 does not show Deputy Watkins conducting his security rounds at least once every 30 minutes, as required by both 6VAC15-20-1040 and the Sheriff's suicide prevention operating procedures. In fact, video surveillance confirms that Deputy Watkins did not enter Dayroom 210 **at all** between 10:02 AM and 2:53 PM, a gap of almost **5 hours**.

39. Video surveillance further shows Mr. Hunter entering his cell at approximately 12:22 PM, over two hours since he was last observed by Deputy Watkins, and remaining there until being found hanging from the top bunk, approximately two and a half hours later. Mr. Hunter's autopsy report confirms that this was the last time he was seen alive[1], and that the exact time at which he hung himself is "unknown."

40. Upon finding Mr. Hunter, Deputy Watkins immediately called a medical emergency, to which several correctional officers responded, including Sergeant Myron

---

[1] Upon information and belief, Mr. Hunter was "seen" on the video after his death, as the last view of him on the video corresponds with this time.

Williams. Sergeant Williams cut Mr. Hunter down from the sheet and attempted CPR, noting in his report that Mr. Hunter began to "gargle" and vomited at this time.

41. At approximately 3:02 PM, Henrico Emergency Medical Services ("EMS") arrived on the scene and took over attempting to resuscitate Mr. Hunter. These attempts were ultimately unsuccessful, and Mr. Hunter was pronounced dead at 3:26 PM by EMS.

42. After Mr. Hunter's body was removed from the scene, investigators entered Cell #5 to remove Mr. Hunter's possessions, and found a letter written by Mr. Hunter detailing his intent to commit suicide.

43. Dr. Jeffrey Gofton, MD, the medical examiner who conducted Mr. Hunter's autopsy, identified the cause of death as: "Hanging." At the time of his death, Mr. Hunter was suffering from bipolar disorder, an objectively serious psychiatric disorder which altered his ability to make decisions. Thus, Mr. Hunter was not of sound mind at the time of his death and did not voluntarily end his own life.

**DEFENDANTS' DUTIES**

44. At all times relevant to this action, Defendants had duties to Mr. Hunter, an inmate at the County Jail, pursuant to the Fourteenth Amendment of the United States Constitution and also under Virginia law.

45. Defendants Wade and Watkins were required to provide Mr. Hunter, and all other inmates/detainees, with constitutionally appropriate access to medical care and constitutionally appropriate housing. Defendants were obligated to take reasonable measures to provide for Mr. Hunter's safety.

46. Defendants Wade and Watkins also owed statutory and common law duties of care to Mr. Hunter, including affirmative duties to provide adequate and safe conditions of detention.

47. Defendant Watkins, as jail staff, had a constitutional duty to refrain from acting with deliberate indifference toward the legitimate medical or mental health needs of all inmates/detainees, including Mr. Hunter.

48. Defendant Wade had a constitutional obligation to not maintain, condone, or otherwise permit unconstitutional conditions of confinement for those housed in the County Jail.

49. Particularly, Defendant Wade was responsible for the day-to-day operations and maintenance of the County Jail.

50. Defendant Wade had the duty of care and custody for Mr. Hunter. While Mr. Hunter was confined in the County Jail, he was in the custody and under the care of Defendant Wade and his deputies, employees, and agents, including Defendant Watkins.

51. Defendant Wade, by and through his deputies, had statutory duties to provide proper medical treatment to Mr. Hunter under Virginia Code § 53.1-126. Under that statute, the Sheriff and jail personnel have a specific responsibility to inmates/detainees that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life-threatening conditions."

52. In connection with Plaintiff's state law claims, Defendant Wade is accountable, under the doctrine of *respondeat superior* liability and/or the doctrine of strict liability, for the actions and inactions of his deputies, agents, and employees.

## COUNT I
### Defendant Watkins
### § 1983 – Deliberate Indifference to Serious Medical Needs

53. Plaintiff incorporates paragraphs 1 through 52 as if fully set forth herein.

54. Defendant Watkins was deliberately indifferent to Mr. Hunter's basic human needs during his confinement, including his need for access to medical or mental health care, amounting to a violation of Mr. Hunter's Fourteenth Amendment rights.

55. Upon information and belief, Defendant Watkins knew Mr. Hunter required additional monitoring and observation based on his threats of self-harm. He further knew that even inmates in general population required physical safety and security checks **at least twice an hour**.

56. Deputy Watkins knew that he could not monitor or observe Mr. Hunter unless he physically walked through Dayroom 210 and entered Mr. Hunter's cell. Yet Deputy Watkins did not even monitor or observe Mr. Hunter twice an hour, which is the minimum required by state administrative regulations and County Jail procedure for **all inmates**.

57. In particular, Deputy Watkins knew that conducting rounds and observing and interacting with Mr. Hunter reduced the risk that he would have an opportunity to commit self-harm. Deputy Watkins knew this when he chose to not conduct rounds or observe Mr. Hunter **at all** for a period of almost **five hours** on July 28, 2019.

58. At this time, Deputy Watkins was aware of, had access to, and had been trained on the monitoring procedure that an inmate on a 30-minute watch required the inmate to be "**physically observed** randomly at least every thirty minutes to insure that

they are breathing, not physically distressed and not engaging in any self-injurious activities."

59. The last time Mr. Hunter was known to be alive was based on his appearance at 12:22 PM on video surveillance, more than two hours since Deputy Watkins last observed him and approximately two and a half hours before he would be found hanging in his cell.

60. Even if Deputy Watkins had been watching the video monitor in the pod, he would have known that Mr. Hunter entered the cell at 12:22 PM, but would have been unable to observe him at all for a period of two and a half hours, in deliberate violation of his responsibilities and with knowledge that such failure posed a serious and unnecessary risk to Mr. Hunter's health and safety.

61. By the time Deputy Watkins found Mr. Hunter, it was too late. Despite the efforts of rescuers, Mr. Hunter was pronounced dead at 3:26 PM.

62. The efforts of the rescuers, however, demonstrate that earlier discovery and intervention would have likely saved Mr. Hunter's life.

63. The medical examiner identified the cause of death as "Hanging."

64. Deputy Watkins' failure to monitor and respond to Mr. Hunter's objectively serious medical/mental health needs, in the face of a subjectively known risk of harm, amounts to deliberate indifference to Mr. Hunter's serious medical needs.

65. Deputy Watkins's deliberate indifference to Mr. Hunter's obvious serious medical needs was a direct proximate cause of his death, insofar as Deputy Watkins' failures to act delayed or prevented Mr. Hunter's access to life saving medical care.

66. Deputy Watkins' actions and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Mr. Hunter's constitutional rights, such that Plaintiff is entitled to recover punitive damages.

67. WHEREFORE, Deputy Watkins' violations of the Fourteenth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys' fees and costs.

## COUNT II
### Defendants Wade and Watkins
### State Law – Gross Negligence

68. Plaintiff incorporates paragraphs 1 through 67 as if fully set forth herein.

69. While incarcerated at the County Jail, Mr. Hunter was reliant on the care of Defendant Wade and his deputies, and specifically Deputy Watkins, to monitor him while he was suffering from a mental health condition and while housed in mental health **observation** housing. These Defendants had a duty to exercise reasonable care with regard to Mr. Hunter while he was confined in the County Jail. These Defendants had specific duties to reasonably ensure that Mr. Hunter was not subject to unnecessary suffering and that he had reasonable access and attention to his serious mental health needs.

70. In fact, the primary need that Mr. Hunter had was the need for observation. Deputy Watkins primary responsibility to Mr. Hunter was to observe him. Deputy Watkins completely failed to do so.

71. By failing to conduct any security rounds or to take any actions at all for five hours, Defendant Watkins acted with willful and wanton disregard to Mr. Hunter's

safety and was otherwise grossly negligent in monitoring Mr. Hunter and addressing his serious medical needs.

72. Defendant Watkins was grossly negligent in completely failing to ensure that Mr. Hunter was being physically monitored according to the orders of mental health staff. Defendant Watkins willfully and wantonly failed to monitor Mr. Hunter and failed to make physical security checks as required by state law and jail procedure.

73. As a direct and proximate result of Defendant Watkins' willful and wanton failure to appropriately monitor Mr. Hunter, his suicide attempt was unobserved and his rescue was delayed long enough for him to die.

74. As Defendant Watkins' omissions occurred in the course and scope of his employment with Defendant Wade, Defendant Wade is vicariously liable for his gross negligence and the resulting harm under the doctrine of *respondent superior*.

WHEREFORE, based upon the foregoing, Plaintiff demands judgment against Defendants, jointly and severally, in an amount in excess of $1,500,000, for compensatory damages, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees.

WHEREFORE, the Defendants' conduct, having been so indifferent, willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, Plaintiff demands the award of punitive damages against Defendants, jointly and severally, in a just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred.

WHEREFORE, Plaintiff seeks such further and additional relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully filed,

**ANGELA CARTER**
*ADMINISTRATRIX* **of**
**the ESTATE OF TRAVIS HUNTER**

_____/s/_____
Seth R. Carroll (VSB No. 74745)
Commonwealth Law Group, LLC
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 999-9999
Facsimile: (866) 238-6415
scarroll@hurtinva.com


_____/s/_____
Jonathan E. Halperin, Esq. (VSB No. 32698)
Andrew Lucchetti, Esq. (VSB No. 86631)
Halperin Law Center, LLC
4435 Waterfront Drive, Ste. 100
Glen Allen, VA 23060
Phone: (804) 527-0100
Facsimile: (804) 597-0209
jonathan@hlc.com
andrew@hlc.com
*Counsel for Plaintiff*